**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| BRUCE JONES, )<br>)<br>Petitioner, )<br>)<br>v. )<br>)<br>UNITED STATES OF AMERICA, )<br>)<br>Respondent. ) | Case No. 1:17-cv-01498-TWP-TAB |

**ORDER DENYING MOTION FOR RELIEF PURSUANT TO 28 U.S.C. § 2255**
**AND DENYING A CERTIFICATE OF APPEALABILITY**

This matter is before the Court on a Motion for Relief Pursuant to 28 U.S.C. § 2255 filed

by Petitioner Bruce Jones ("Jones"). For the reasons discussed in this Entry, the motion is **denied**

and **dismissed with prejudice.** In addition, the Court finds that a certificate of appealability

should not issue.

### I.    SECTION 2255 MOTION STANDARDS

A motion pursuant to 28 U.S.C. § 2255 is the presumptive means by which a federal

prisoner can challenge his conviction or sentence. *See Davis v. United States*, 417 U.S. 333, 343

(1974). A court may grant relief from a federal conviction or sentence pursuant to § 2255 "upon

the ground that the sentence was imposed in violation of the Constitution or laws of the United

States, or that the court was without jurisdiction to impose such sentence, or that the sentence was

in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28

U.S.C. § 2255(a). The scope of relief available under § 2255 is narrow, limited to "an error of law

that is jurisdictional, constitutional, or constitutes a fundamental defect which inherently results in

a complete miscarriage of justice." *Borre v. United States*, 940 F.2d 215, 217 (7th Cir. 1991)

(internal citations omitted).

## II.     FACTUAL BACKGROUND

### A.    Pre-Trial

On May 15, 2012, Jones was charged in a 48-count Indictment with one count of health care fraud, forty-six counts of felon in possession of a firearm and one count of felon in possession of ammunition. *See USA v. Jones*, 1:12-cr-00072-TWP-DML (hereinafter, "Crim. Dkt."), Crim. Dkt. 1. Prior to Indictment, Jones was represented by Linda Wagoner, who did not make a formal appearance in the case. *See, e.g.*, Crim. Dkt. 243 at 7 (referencing a plea offer made to counsel Linda Wagoner). Thereafter, Jones went through a number of different lawyers during his proceedings, including (1) Larry Champion, Crim. Dkt. 10, (2) Zaki M. Ali, Crim. Dkt. 15, (3) John D. Manley ("Manley"), Crim. Dkt. 35, (4) Charles David Pumphrey ("Pumphrey"), Crim. Dkt. 58, and (5) Richard Mark Inman ("Inman"), Crim. Dkt. 207.

On June 4, 2013, the charges against Jones were consolidated and a federal grand jury returned a four-count Second Superseding Indictment. Crim. Dkt. 49. Count 1 charged Jones with health care fraud in violation of 18 U.S.C. § 1347. Counts 2-4 each charged Jones with being a felon in possession of a firearm or ammunition in violation of 18 U.S.C. § 922(g)(1). Jones was prohibited from possessing firearms based on a prior felony conviction on March 12, 1985 for dealing a Schedule IV controlled substance (lorazepam and the sedative ethchlorvynol) to another person. Crim. Dkt. 175 at 9.

On June 13, 2013, the Court granted the Government's Motion to Sever Count 1 from Counts 2-4 (Crim. Dkt. 77) and Jones' Motion to Sever Counts and Request for Separate Trials (Crim. Dkt. 80). In particular, the Court severed Count 1 ("health care fraud") from Counts 2-4 ("felon in possession of firearms") and ordered that the firearm charges be tried separately. Crim. Dkt. 94.

**B.** **Trial 1:  Felon in Possession of Firearm**

The Government elected to first proceed with trial on the firearm charges.  Jones was represented by attorneys Pumphrey and Manley.  On July 5, 2013, the Court denied Jones' seventh motion for continuance of the trial and ordered that the jury trial would proceed as scheduled on July 8, 2013.  Crim. Dkt. 130.  On the morning of trial, Jones failed to appear because he had been hospitalized that morning following a self-overdose of prescription medications.  Crim. Dkt. 135; Crim. Dkt. 229 (July 8, 2013 status hearing).  Based on his failure to appear, the Government moved for detention under 18 U.S.C. § 3142(f)(2) on the grounds that Jones was a risk of flight, posed a risk of obstructing justice, posed a risk of harm to any other member of the community (himself), and based upon his actions there were no conditions or combinations of conditions that could have reasonably assured his attendance at trial.  Crim. Dkt. 137.  The Court granted the motion.

Jones was taken into custody and appeared in court the next day, July 9, 2013.  The Court granted Jones' request to continue the trial and *sua sponte* ordered a new competency evaluation[1] based on Jones' irrational behavior.  Crim. Dkt. 138.  The Court explained that although "Mr. Jones may be manipulative; and this may have been his whole plan to get his eighth continuance," it felt obliged to take that step.  Crim. Dkt. 230 at 8, 14 (July 8, 2013 status hearing). Judith Campbell, Ph.D. ("Dr. Campbell"), a forensic psychologist, examined and evaluated Jones. On October 15, 2013. a competency hearing was held.   Dr. Campbell reported that Jones "exhibits a pervasive pattern of grandiosity and inflated self-importance, a belief that he is unique and special,

---

[1] The Government had previously moved for a competency evaluation following Jones' submission of a letter to his counsel from a Dr. William Able wherein Dr. Able opined that due to the death of Jones' brother, Jones is in such a state of depression that he could not participate in his own defense.  Crim. Dkt. 131 at 2.  Following a hearing on July 5, 2013, and based on the opinions of both Dr. Able and forensic psychiatrist Dr. George Parker, the Court found Jones was presently competent to proceed to trial. *Id*. at 4.

and a[] sense of entitlement." Crim. Dkt. 243 at 4-5. Dr. Campbell offered a diagnosis of Adjustment Disorder with Depressed Mood and Personality Disorder Not Otherwise Specified with Narcissistic Features (Crim. Dkt. 148 at 7-8). The Court found by a preponderance of the evidence that Jones had the present mental competency to proceed with trial. Crim. Dkt. 243 at 4-5. The Court expressed "doubts [during the competency hearing] that the suicide attempt was accidental. I think it was an intentional attempt … to be manipulative, to obstruct justice." *Id.* at 34-35. In support of that conclusion, the Court noted that Jones was a licensed substance abuse counselor "in the business of recommending dosage for the exact types of medications that he almost overdosed on." *Id.* at 35.

A four-day jury trial on the firearm charges was held from October 21-24, 2013. After less than an hour of deliberations, the jury found Jones guilty of the three firearm charges. Crim. Dkt. 222 at 100. On March 25, 2014, the Court sentenced Jones to three concurrent 100-month terms of imprisonment. Crim. Dkt. 224 at 76. A two-level increase for obstruction of justice was added because Jones had failed to appear for trial on July 8, 2013, by overdosing on a cocktail of prescription drugs that he was familiar with, and for instructing his neighbor to remove numerous firearms from his cabin in Montana in an effort to hide them from federal authorities. *Id.* at 15-18. Relevantly, in pronouncing the sentence, the Court reiterated the following:

> Mr. Jones is well educated and a very intelligent man. He has numerous degrees, including a certification as an addiction specialist, which leads this Court to believe, despite what Mr. Jones says, that he did intentionally take an overdose of prescription medications the morning of trial to delay going to trial after the Court denied his numerous requests for a continuance.
>
> He has a degree in criminal justice and criminology that were earned after he was released from prison on the first case. Mr. Jones is well aware that he was not allowed to possess these firearms or ammunition. And for many, many years, he was deceitful and conniving and tried to find ways around the law. He alleges that he had transferred all of these weapons to his wife, but she was not living at the home at the time of this search, nor had she ever been to the Montana property.

Mr. Jones used his patients and clients to add to his gun collection. 47 firearms were seized from his residence and properties, 14,000 rounds of ammunition. And it is just totally impossible, the sheer volume of firearms and ammunition, to not know of their existence.

…

Mr. Jones does have a personality disorder with narcissistic features. Mr. Jones exhibits behavior, and I believe he is manipulative, he believes he's above the law. He's very defiant, very obstinate. And I think his personality is such that if he wants to possess firearms again once he's released from prison on this case, he will, regardless of what this Court orders or what the laws in this country tell him.

Mr. Jones did not -- does not feel that his actions were criminal, and he maintains his innocence, which is his perfect right to do so, but the evidence of his guilt and the evidence that this jury heard was overwhelming.

…

Given Mr. Jones' blatant disregard for the laws and his attempts to obstruct justice, a sentence of 100 months is appropriate.

*Id.* at 80-83. Following advisement of his appellate rights, Jones stated that he wished to appeal. On the same day of sentencing, the Clerk filed a Notice of Appeal on Jones' behalf as to the judgment related to his firearm charges. Crim. Dkt. 189. Jones' appeal on the firearm charges was ultimately dismissed for lack of appellate jurisdiction shortly before sentencing on his health care fraud charges. Crim. Dkt. 319.

Jones' attorneys in the firearm trial, Pumphrey and Manley, withdrew as counsel after sentencing on the firearm charges was completed. Crim. Dkt. 205.

### C. Trial 2: Health Care Fraud Trial

Proceedings continued against Jones in his health care fraud trial. CJA Counsel Inman was appointed to represent Jones. Crim. Dkt. 207, 208. However, shortly before trial, Jones expressed dissatisfaction with his counsel. Crim. Dkt. 269; Crim. Dkt. 270. Jones wrote a letter to the Court requesting that a new attorney be appointed because his attorney wanted him to accept the plea

offer and did not want him to go to trial. Crim. Dkt. 269; Crim. Dkt. 343. On October 15, 2014, an *ex parte* hearing on Jones' request for new counsel was held before Magistrate Judge Tim Baker. Jones asserted that his appointed counsel, Mark Inman, failed to communicate with him, refused to call witnesses, and refused to present evidence. *See* Crim. Dkt. 343 at 8-10. Inman explained that it was in Jones' best interest to accept the plea agreement the Government had offered because it was "a very good offer." *Id.* at 7, 18-19. Inman additionally defended his actions because "the witnesses [Jones] wants to call are not going to help him," so it "would just be absolutely foolish for him to go to trial." *Id.* at 7. Inman also compared this to Jones' first trial, where both Jones and his wife testified, but the jury still found him guilty in less than an hour. *Id.* at 18-19. Inman stated that Jones had already experienced what it is like to "present the defense that he thinks is going to work and ha[d] it slammed down his throat," and he believed this would be the same scenario. *Id.* Inman also asserted that he had read through "every piece of paper that the government has now," had reviewed everything necessary to understand the case, and had read and followed up on every letter Jones had sent him. *Id.* at 16, 18. Finally, he asserted that if he called the expert witness Jones wanted him to call, that would be "one of the biggest cases of malpractice ever" and that the evidence Jones believed would help him would "just come and backfire on him extraordinarily badly." *Id.* at 16-17.

In considering Jones' request for a new counsel, Magistrate Judge Baker stated that "many of these things [that Jones wanted Inman to do] may not bear any fruit as it relates to the defense of your case," and that he was left with "the impression that [Jones] want[ed] to go down a lot of roads that skilled trial counsel would think would be unnecessary." *Id.* at 9-10, 21-22. Magistrate Judge Baker ultimately denied Jones' request, opining that Inman was "one of the most skilled

lawyers" on the CJA panel and because Inman indicated he would still be able to represent Jones despite the disagreement. *Id.* at 21.

On October 20, 2014, an accept/reject plea hearing and hearing on pending motions *in limine* was held. At the *ex parte* portion of the hearing, Jones again requested a new attorney. Crim. Dkt. 347 at 7-11. Inman responded that he was "prepared to go to trial, [but Jones] doesn't have a viable defense . . . [And] I can't create fiction out of the air." *Id.* at 13. Although Jones had some witnesses he wanted to call, Inman emphasized that "[t]hey would hurt him," and that Inman had discussed this with Jones approximately five times in the previous month. *Id.* Jones asserted that Inman never met with him to discuss his defense, but Inman countered that that was not true, explaining, "I mean, that's just it. I have to listen to this every time I go see him. He's incapable of telling the truth and talking about things. So it doesn't do any – it's counterproductive." *Id.* at 13-14. In response, Jones asserted, "it's clear and evident that he's not going to represent me to the best of his ability. He's called me a liar in open court. Please, Your Honor, appoint another attorney to represent me." *Id.* at 14.

In response, the Court explained "I don't know of another attorney that can represent you, Mr. Jones, because you're going to have the same problem. You know, we had these same issues in your first trial. You had how many lawyers? About five?" and "you just have lots of problems with lawyers, and we just can't keep giving you lawyer after lawyer after lawyer. You've got to try to work with the lawyer that you have." *Id.* at 14-15. The Court denied Jones' request for a new attorney and confirmed that Inman could proceed to trial, although Inman expressed that he was "just tired of being berated by him." *Id.* at 16. Inman reiterated that he believed the Government's plea offer to be a "gift." *Id.*

In the midst of his health care fraud trial, Jones again requested a new attorney. During the Government's case-in-chief, Jones objected to Inman's failure to introduce evidence when cross-examining the witnesses. *See* Crim. Dkt. 337 at 231-35. The exchange proceeded as follows:

MR. INMAN: Judge, I can't keep doing this every 90 minutes with him, all right?

THE COURT: Well --

MR. INMAN: All right. I mean, the fact of the matter is, the documents that these people signed, they didn't know how he had billed, all right? And once they found out that he fraudulently billed sessions that they weren't at, for instance, as you just heard, and I told him when these families would testify, that it was going to be a slam dunk for the government. You heard Jeffrey Adams testify that there were 29 times he was at work –

THE DEFENDANT: But that's because --

MR. INMAN: -- when he billed him.

THE DEFENDANT: All right. That's because --

MR. INMAN: It's because he made --

THE COURT: Shh. Let your lawyer talk.

MR. INMAN: It's because he made it up, and he can't take the stand and say that he didn't, all right? And that's my -- I just have to approach it this way. All of the records they're using are his. Those are his bills. I have –

THE DEFENDANT: I did not make it up, Your Honor.

…

MR. INMAN: And I believe that most of what he has is either doctored or misleading or false.

THE DEFENDANT: Your Honor, they are not doctored or misleading or false. In fact, yesterday one of the witnesses even verified that he signed it. And today, you can ask – I mean, you can ask the witness if they signed it. And they did it.

MR. INMAN: It's misleading.

THE COURT: Have you discussed this with your client?

MR. INMAN: Yes, Judge. I've told him that I'm not introducing this stuff.

THE DEFENDANT: This does what, Your Honor? I haven't seen anything.

THE COURT: The rules -- his Rules of Professional Responsibility…

MR. INMAN: I can't keep defending myself, all right? I can't keep doing it.

THE COURT: I understand, Mr. Inman, but --

MR. INMAN: We're doing this every 75 minutes now, and I can't keep doing it.

THE COURT: You've got to --

MR. INMAN: If he wants to represent himself, then let him do it right now.

THE COURT: Well, I don't think he wants to represent himself. Do you want to represent yourself?

THE DEFENDANT: I don't have the knowledge to do that, but I want my attorney to represent me and call my witnesses and produce my evidence. I mean, how can I – how can I possibly –

MR. INMAN: Which we've been through, which he doesn't have. I told him that this case was a slam dunk case once the families started testifying. That's what he's seeing, and he's getting nervous and he's reacting.

THE DEFENDANT: No, Your Honor, I'm not. I've been saying this all along. And you can see from his attitude, what he just said now, he doesn't want to defend it, he hasn't wanted to defend it, and he's clearly saying that I'm guilty. And I'm not.

MR. INMAN: There's a difference between not defending it and him being indefensible. And that's what it is.

*Id.* The Court urged Jones to keep talking to his lawyer and to work it out. *Id.* At the conclusion of a trial that lasted just over two days, the jury found Jones guilty of the health care fraud charge in less than 45 minutes. Crim. Dkt. 339 at 45, 47.

Two months later, Jones again wrote to the Court to request a new counsel for his sentencing. At the *ex parte* hearing on a request for new counsel, this time before Magistrate Judge

Mark Dinsmore, Jones again complained of his inability to call witnesses to trial, produce evidence, show PowerPoint slides, and present his case. Crim. Dkt. 349 at 2. He also wanted to call witnesses to speak on his behalf during sentencing, but his attorney was refusing to allow him to do so. *Id.* at 2-3. He also complained of his attorney's failure to provide him with a copy of the Presentence Investigation Report (PSR). *Id.* at 3. Inman asserted that he had properly explained the timing of the PSR to Jones and Jones was misrepresenting the handling of the PSR to the Court. *Id.* at 4, 6-7. Jones had already "had a full-blown sentencing on [the firearm charges] in which a lot of these character witnesses that he had write letters – all of that has already been presented to Judge Pratt." *Id.* at 4. Inman also explained that Jones had previously gotten a two level increase for obstruction of justice when "he faked a heart attack before the first trial, he and his wife got up and concocted a defense that the jury did not believe at all in the first trial. And they would do the same thing if they testified at their sentencing in this case." *Id.* at 5. Inman asserted that the PSR was "even more in our favor" than he thought it would be, and "we can't help ourselves by presenting stuff." *Id.* "And what [Jones] wants to do, and the way that he and his wife would do it, would only hurt him….he's in great shape to not get any more time, and I'm ready to do the sentencing and get this done." *Id.* at 6. Magistrate Judge Dinsmore found "Inman's representations entirely credible," and because Jones was "entitled to a competent attorney, not to the attorney of [his] choice," and had failed to show that Inman's "errors [were] so serious that he's not functioning as your counsel guaranteed by the Sixth Amendment" or that he had been prejudiced by any of those deficiencies, Jones' request for new counsel was denied. *Id.* at 8.

Inman's prediction regarding the sentencing hearing was correct. On April 3, 2015, Jones was sentenced to 90 months of imprisonment for the health care fraud charge, to run concurrently to his 100-month firearm sentences. Crim. Dkt. 351 (April 3, 2015 sentencing hearing). On the

same day of sentencing, at Jones' request, the Clerk filed a Notice of Appeal on his behalf as to his convictions and sentences for all charges.  Crim. Dkt. 330.

## D. <u>Appeal</u>

In his direct appeal, Jones raised four issues:  (1) his *ex parte* pretrial restraint of certain life insurance policies violated his Fifth and Sixth Amendment rights; (2) the district court erroneously denied his request for new counsel during his health care fraud trial; (3) he was denied the opportunity to testify at his health care fraud trial; and (4) he challenged the Court's sentencing guideline computation.  *Jones v. United States*, 844 F.3d 636, 639 (7th Cir. 2016).  The Seventh Circuit Court of Appeals rejected all of Jones' claims, and affirmed his conviction and sentence. *Id.*

As to his claim regarding his request for new counsel, the Seventh Circuit found that despite the "rocky relationship" between Jones and Inman, the Court did not abuse its discretion in denying Jones' request for a new counsel, although it did not reach the separate question of whether his Sixth Amendment right was compromised.  *Id.* at 642.  In reaching its holding, the Seventh Circuit noted that the district court's inquiry into Jones' concern was adequate, noting that Jones "had ample opportunity to present his concerns to the district court" and that "the district judge and the two magistrate judges listened to [defendant's] concerns, and responded thoughtfully and appropriately."  *Id.* at 643 (internal citation and quotation omitted).  The nature of the conflict between attorney and client gave the Seventh Circuit pause.  The Seventh Circuit discussed the letters Jones sent regarding the communication breakdown, and noted that they "hesitate to place too much importance on Jones' letters, which show that Jones harbored unrealistic expectations about his attorney's obligations."  *Id.* at 643.

…It is difficult on the face of this record to determine whether the conflict between Inman and Jones at that point involved a true breakdown in communication or simply a mismatch of expectations.

By the time of trial, however, the relationship between the two had grown quite strained. Inman made a series of remarks to the court that reflected his frustration with his client. … Such statements, accurate though they were, obviously cast doubt on the viability of the attorney-client relationship.

These matters are left to the sound discretion of the district judge, however, because she was much closer to the friction between client and attorney and to its larger context in the case. Despite the obvious tension between Inman and Jones, we find no abuse of discretion here. The record shows that Jones had engaged in a prolonged pattern of obstructionist behavior. Against that backdrop, the district judge could reasonably have inferred that Jones's request for a new lawyer was yet another attempt to delay justice. In fact, prior to Inman's appointment as his lawyer, Jones had cycled through three other attorneys or legal teams during just the adversarial stage of the proceedings. He had also requested multiple delays for the first trial, on the firearms charges. Then, on the morning trial was set to begin, Jones failed to appear. He had taken a cocktail of medications that caused him to lose consciousness. The scheduled trial had to be delayed again.

…

Given the history of the case, including Jones's pattern of delay and obstruction, the district judge did not abuse her discretion in denying Jones's request for appointment of yet another lawyer. *Id.*

During his appeal, Jones also asserted that he was denied the right to testify during his health care fraud trial. The Seventh Circuit rejected this claim, noting that "[b]ased on our review of the record, we disagree. The district judge correctly found that Jones waived his right to testify. The judge engaged in three colloquies with Jones on the subject. While Jones' responses during the first two colloquies were ambiguous, his third response was an unequivocal waiver." *Id.* at 645. The Seventh Circuit held that the "district judge here made clear that the decision whether to testify was ultimately up to Jones, and she asked three times to ensure that his waiver was knowing and voluntary," and therefore, because he was properly apprised of his constitutional right, Jones waived it. *Id.* at 646.

E.       **§ 2255 Motion and Responses**

Jones filed a *pro se* motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255 on May 8, 2017, and this action was opened. CJA Counsel Mario Garcia was appointed to represent Jones with his § 2255 motion. A supplemental motion was filed on August 10, 2017. Dkt. 14. The Government has responded in opposition on several occasions. *See* Dkts. 24, 25 and 36[2]. Jones has never filed a reply to any of the Government's responses.

In ruling on a motion under § 2255, the district court is required to hold a hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255; *see, e.g.*, *Pham v. United States*, 317 F.3d 178, 185 (2d Cir.2003) (§ 2255 does not permit summary dismissals of motions that present facially valid claims). However, the filing of a motion pursuant to § 2255 does not automatically entitle the movant to a hearing. To warrant a hearing, the motion must set forth specific facts supported by competent evidence, raising detailed and controverted issues of fact that, if proved at a hearing, would entitle him to relief. *Machibroda v. United States*, 368 U.S. 487, 494 (1962). Jones has not requested a hearing and the Court determines a hearing is not required.

## III.       DISCUSSION

Over the course of fifteen pages (*see* Dkts. 1, 16, 17), Jones lists a litany of complaints about wrongs to his ex-wife, prison conditions,[3] and allegations of ineffective assistance of counsel as to two of his trial counsel, Pumphrey and Inman. Attorney Mario Garcia, Jones' counsel in the

---

[2] On February 20, 2018, the Court ordered the Government to further develop its response to Jones' claim that Pumphrey provided ineffective assistance of counsel. (Dkt. 26.) Pumphrey declined the Government's request for a declaration addressing the ineffective counsel claims, unless ordered to do so by the Court. (Dkt. 36 at 2.) The Government elected to proceed without a declaration from Pumphrey and filed their supplemented response on May 3, 2018. (Dkt. 36.)

[3] The Court is concerned and regrets that Jones is being mistreated while in the Bureau of Prisons. However, these claims and issues are not properly addressed in a §2255 motion. Perhaps Attorney Garcia can provide guidance regarding any potential prison litigation claims.

present matter, prepared a Supplemental Petition for Writ of Habeas Corpus highlighting allegations of ineffective assistance of counsel by Inman only. Dkt. 14. The Court notes that Jones' petition often confuses claims related to his firearms trial with claims related to his health care fraud trial – for example, in one sentence, Jones will be talking about firearms, and in the next, he will be talking about health care coding. Nonetheless, the Court reviewed Jones' list in detail and summarizes his primary claims as follows. Jones alleges that Pumphrey, lead counsel for the firearm trial, provided ineffective assistance of counsel. He also alleges that Inman, his counsel for the health care fraud trial, provided ineffective assistance of counsel. Jones appears to separately assert that his sentencing computation was improper for "looking back" to his 1984 conviction. *See* Dkt. 17 at 1-2.

A.      **Ineffective Assistance of Counsel Standard**

A petitioner claiming ineffective assistance of counsel bears the burden of showing (1) that trial counsel's performance fell below objective standards for reasonably effective representation and (2) that this deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 688-94 (1984); *United States v. Jones*, 635 F .3d 909, 915 (7th Cir. 2011). If a petitioner cannot establish one of the *Strickland* prongs, the court need not consider the other. *Groves v. United States,* 755 F.3d 588, 591 (7th Cir. 2014). To satisfy the first prong of the *Strickland* test, a petitioner must direct the court to specific acts or omissions of his counsel. *Wyatt v. United States,* 574 F.3d 455, 458 (7th Cir. 2009). The court must then consider whether in light of all of the circumstances whether counsel's performance was outside the wide range of professionally competent assistance. *Id.* In order to satisfy the prejudice component, a petitioner must establish that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. In addition, in attacking trial counsel's

performance, a defendant "must 'overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.'" *Frentz v. Brown,* 876 F.3d 285, 293 (7th Cir. 2017) (quoting *Strickland,* 466 U.S. at 689).

**B.     Ineffective Assistance of Counsel Claims against Pumphrey**

Jones alleges that Pumphrey was ineffective for: (1) pressuring him to pay fees before proceeding; (2) refusing to investigate, talk to, or call witnesses; and (3) refusing to allow Jones to appeal since there were no more funds to pay for an appeal.  The Court will address each allegation in turn.

**1.     Pressuring Payment**

Jones asserts that Pumphrey forced him to sign a fee agreement turning over his house to foreclosure or Pumphrey would walk out on him on the eve of trial.  *See* Dkt. 1 at 1-2.  He also alleges that Pumphrey threatened he would not talk to or investigate witnesses, because Jones owed him so much money.  *Id.*  If Jones' statements are true, Pumphrey's acts may reflect on his ethical obligations as an attorney, but the purpose here is to review whether Pumphrey was an effective counsel for Jones.  During the final pretrial conference hearing, Pumphrey noted that he had investigated and spoken to the seventeen listed witnesses.  Pumphrey was not indifferent during the trial, rather the trial transcripts reflect that Pumphrey vigorously defended his client by calling as witnesses Jones and his ex-wife, Larissa Jones ("Larissa"), asking appropriate questions, making appropriate objections, cross-examining witnesses, and presenting the closing statement. Moreover, interest on Jones' debt to Pumphrey did not accrue until the trial was over, and Pumphrey's collection proceedings did not commence until January 2017, after Jones' appeal concluded.  *See* Dkt. 1 at 7-8.

Jones fails to satisfy the first prong of *Strickland* by failing to identify any specific act or omission of his counsel related to Jones' failure to pay, and also fails to establish he was prejudiced during Pumphrey's representation by the requirement that he sign a fee agreement. *See Strickland*, 466 U.S. at 694. Accordingly, Jones' claim of ineffective assistance on this ground fails.

### 2. Refusing to Investigate, Talk to or Call Witnesses

Jones makes a number of complaints regarding witnesses. He alleges that David Sokol ("Sokol") would have testified that he purchased certain firearms for Larissa and complains that Pumphrey failed to address the fact that Sokol could not testify on his behalf because Sokol was a target of the Grand Jury at the behest of Assistant United States Attorney Shepard. Dkt. 1 at 2. He asserts that Jeremy Waymire, Russ Miller, Richard Desenfants, and Bud McCorkle would have testified on his behalf that his ex-wife, Larissa, owned all of the firearms, and none of the firearms were in his control. *Id.* at 2-3. He also asserts that Thad Shively, Marin Casistru, Dr. David G. Jones (his brother), Sandra Jones, Marshall Farmer, Linda Reck, Chris Paxton, Troy Evans, and Sharon Campbell would have testified on his behalf. Dkt. 16 at 2-7. He finally alleges that Larissa was not properly prepared for Pumphrey's questioning at trial. *Id.* at 7.

"The Constitution does not oblige counsel to present each and every witness that is suggested to him." *Blackmon v. Williams*, 823 F.3d 1088, 1103 (7th Cir. 2016) (internal quotation omitted). "Rather, counsel need only investigate possible lines of defense and make an informed decision." *Id*. "If counsel has investigated witnesses and consciously decided not to call them, the decision is probably strategic." *United States v. Best*, 426 F.3d 937, 945 (7th Cir. 2005). Strategic decisions like these, so long as they are made after a thorough investigation of law and facts, are "virtually unchallengeable." *Strickland*, 466 U.S. at 690.

"Complaints of uncalled witnesses are not favored in federal habeas corpus review." *United States ex rel. Cross v. DeRobertis*, 811 F.2d 1008, 1016 (7th Cir. 1987) (internal quotation omitted). "[I]f potential witnesses are not called, it is incumbent on the petitioner to explain their absence and to demonstrate, with some precision, the content of the testimony they would have given at trial." *DeRobertis*, 811 F.2d at 1016. To meet this burden, "the petition must be accompanied with a detailed and specific affidavit which shows that the petitioner had actual proof of the allegations going beyond mere unsupported assertions." *Prewitt v. United States,* 83 F.3d 812, 819 (7th Cir. 1996).

As an initial matter, the Court notes that Jones fails to provide any affidavit from any of the alleged proposed witnesses. Pumphrey filed an Amended Witness List that named seventeen potential witnesses for the firearms case. Crim. Dkt. 118. Jeremy Waymire, Russ Miller, Richard Desenfants, Bud McCorkle, Thad Shively, Marshall Farmer, Chris Paxton, and Sharon Campbell were identified on Jones' July 2, 2013 list. The record demonstrates that Pumphrey considered, but declined to call, these individuals as witnesses. Crim. Dkt. 239 at 34-39; Crim. Dkt. 243 at 14-17 (Pumphrey reviewing the Amended Witness List with the Court during the October 15, 2013 final pretrial conference). Concerning witnesses, the record in this case reflects the following discussions and actions by Pumphrey:

- Jeremy Waymire – Allegedly participated in a transfer of firearms and recording of the firearms for insurance purposes. Considered, but decided not to call. Crim. Dkt. 239 at 35; Crim. Dkt. 243 at 14.

- David Sokol – Was under grand jury investigation. Sokol declined to testify on the advice of his counsel. Crim. Dkt. 243 at 14-15.

- Russ Miller – Allegedly would testify that he'd never seen Jones with a firearm. Considered, but decided not to call. Crim. Dkt. 243 at 14.

- Richard Desenfants – Allegedly would testify that he'd never seen Jones with a firearm. Considered, but decided not to call. *Id*. at 14-15.

- Bud McCorkle – Pumphrey spoke with McCorkle. Considered, but decided not to call. *Id*. at 15.

- Thad Shively – Considered, but decided not to call. *Id*. at 14.

- Marin Casistru – A friend from Moldova who tossed a rifle at Jones at one point. Jones fails to provide an affidavit asserting that Pumphrey failed to consider him as a witness or was aware of him. Nor would Casistru's testimony about a two-week vacation with Jones have been exculpatory or relevant.

- Dr. David G. Jones (his brother) – Unavailable to testify because he died before the original July 2013 trial date. Crim. Dkt. 239 at 35.

- Sandra Jones – Allegedly knew of the emails between Jones and his brother. However, she would not have been able to testify as to the emails under the Federal Rules of Evidence. Her testimony would not have been exculpatory or relevant.

- Marshall Farmer – Considered, but decided not to call. Crim. Dkt. 243 at 15.

- Linda Reck – Allegedly would have testified that she cleaned the house several times and never saw any weapons. Her testimony would not have been exculpatory or relevant given the Government's evidence, described below.

- Chris Paxton – Considered, but decided not to call. Crim. Dkt. 243 at 15.

- Troy Evans – Allegedly would have testified as to Bud McCorkle's affidavit to confirm the truth. However, under the Federal Rules of Evidence, Evans would not have been

able to testify as to another individual's affidavit. His testimony would not have been exculpatory or relevant.

- Sharon Campbell – Considered, but decided not to call. Crim. Dkt. 243 at 16.

The Court determines that Pumphrey's decision regarding these witnesses was likely strategic, and "virtually unchallengeable." *Strickland*, 466 U.S. at 690.

Regarding the complaint that Pumphrey failed to hire an expert in the case, Jones does not identify the type of expert he believes counsel should have hired or explain how an expert would have changed the outcome of his case. His failure to adequately develop this claim results in its waiver. *United States v. Irons*, 712 F.3d 1185, 1190 (7th Cir.2013) (underdeveloped arguments are waived). In addition, this claim fails on the merits. If Jones desired an expert to challenge the quality of the firearms, that testimony would not have aided him. The main issue at trial was whether Jones "possessed" the guns, and not whether they were in fact firearms—it was undisputed that a large majority of the guns qualified as firearms under 18 U.S.C. § 922(g).

Given the overwhelming evidence presented by the Government to demonstrate Jones' possession of firearms, it is unclear what value the uncalled witnesses' testimonies would have provided to Jones' case. Trial evidence showed that agents recovered from Jones' Anderson, Indiana residence: a loaded Smith and Wesson .357 caliber revolver from the "male" clothing side of the closet in the master bedroom; an unloaded 12-gauge Remington shotgun next to a sword and male clothing in an upstairs bedroom; and 25 metal boxes containing over 10,000 rounds of ammunition of varying sizes and gauges in an unlocked utility closet in the basement. Crim. Dkt. 323 at 6. Additionally, 35 firearms were recovered from another of his Anderson, Indiana homes, which Jones used as his office. *Id.* at 6-8. When Jones learned that a search warrant had been executed at his homes in Anderson, Jones asked his neighbor in Montana to remove all the

weapons at his Montana residence and provided the neighbor with the combination to the safe inside the cabin. Still, agents found a gun belt in a nightstand next to a bed in his Montana home. Ultimately, Jones' neighbor provided an accounting of the 15 firearms he removed from the Montana residence at Jones' direction. *Id.* at 7-8.

The Government also presented documentary evidence of Jones' possession of firearms. Jones and his ex-wife, Larissa, did not meet until 1995. On April 2, 1996, Jones and Larissa executed a prenuptial agreement, which outlined Jones' assets. *Id.* at 8. On the list of "Items Belonging to Bruce E. Jones" were 15 pistols, nine shotguns, and 14 rifles. Shortly after Larissa obtained her United States citizenship, she and Jones signed a "Transfer, Receipt, and Agreement of Firearms". In this document, Jones reportedly transferred all of the weapons listed on the document with the BEJ Cattle Ranch letterhead to his wife. He further requested that his wife, "...keep them oiled, locked up, and protected until a much later time when (she) might want to sell for retirement." He noted he would purchase metal boxes for ammunition and "help keep a list and look up values" for her. He also requested that Larissa not sell three guns (the Harrington and Richardson pistol, the JC Higgins rifle, and the Stevens 16 gauge shotgun) until he "pass(ed) on."

Jones and Larissa separated sometime between Fall 2009 and Spring 2010, and she was not living in their residence at the time the search warrant was executed in May 2010. *See* Crim. Dkt. 221 at 210-214. Larissa testified that she had never been to Jones' property in Montana. *See* Crim. Dkt. 221 at 178. A document entitled "Dr. Bruce E. Jones, Financial Balance Sheet, April 26, 2009," was found on Jones' computer, which listed "Gun Collection/Ammo" valued at $35,000.00 among his assets. An email sent from Jones to his brother, David, on June 7, 2009, was also found on his computer, which listed the firearms that Jones had, including "at least on(e) gun for each caliber and 30-30 4, 30-06 4 guns." Investigators also found emails in which Jones

was negotiating the purchase of firearms, as well as pictures of Jones holding various guns. In addition, a video was recovered of Jones walking around his Montana cabin, stating that everything in it belonged to him. We know that Jones is making the video because there is a reflection of him in a mirror as he produces his video. In this video, Jones points to two firearms on the wall inside the cabin. Crim. Dkt. 323 at 8-9. In all, 47 firearms were seized from Jones' residence and properties, and Jones maintained records for all of the seized weapons, including those that were purchased after he became a convicted felon in 1985. He used counseling patients to purchase weapons on his behalf when he was no longer able to do so. For example, the 12-gauge Remington shotgun found in his residence was purchased by Sokol. Jones gave Sokol the funds and directed which firearm he was to purchase, thereafter the firearm was given to Jones. As another example, Spencer Kinley testified at trial that he accompanied Jones to Montana and purchased one of the firearms seized from the cabin. Jones gave Kinley cash to purchase the weapon, and Kinley left the gun in the cabin for Jones.

During the final pretrial conference, Pumphrey discussed his consideration of the seventeen listed witnesses. At most, some of Jones' proposed witnesses would be able to testify that, at a particular moment, they did not see firearms in the open or in Jones' possession, but such evidence would not have been exculpatory for Jones. Thus, Jones has failed to show any prejudicial effect from Pumphrey's alleged failure to investigate, talk to, or call these witnesses.

Additionally, Pumphrey likely considered that calling these witnesses could be harmful to Jones' case. For example, Sokol participated in assisting Jones with obtaining a firearm improperly. Jones gave Sokol cash and directed him to purchase a specific 12-gauge Remington shotgun. *See* Crim. Dkt. 323 at 9. The Government was prepared to argue that Sokol was a "straw purchaser" for Jones–which is a violation of federal law.

Jones next contends that Pumphrey failed to properly prepare Larissa for trial, which resulted in her "collapse at trial under extreme stress." However, a review of Larissa's testimony does not reflect that she collapsed at trial under extreme stress. Rather, Pumphrey appeared well prepared when he questioned Larissa. *See, e.g.*, Crim. Dkt. 221.

Because Jones fails to show that Pumphrey's performance was deficient under the first prong of *Strickland*, and he fails to show that he was prejudiced, under the second prong of *Strickland*, Pumphrey's alleged failure to investigate, talk to, call, or prepare certain witnesses was not ineffective assistance of counsel.

### 3. Refusing to Allow Jones to Appeal

Jones asserts that Pumphrey "lied in court when I was ask [sic] if I wanted him to appeal. I said now [sic] and that I have given him more than 70,000 and he denied that. I said I was not satisfied and wanted him terminated and had no more funds to pay for appeal." Dkt. 16 at 7.

The sentencing transcript does not reflect Jones' statement:

[The Court]: If you intend to appeal, and you tell me now, the clerk of the court will prepare a notice of appeal for you. And you can let me know now. Will you be able to afford to hire your own counsel? Are these counsel going to do an appeal, or are you –

THE DEFENDANT: I would like to appeal, Your Honor. I don't have funds to pay for it.

Crim. Dkt. 224 at 86. There are no representations in that hearing by Pumphrey regarding representing Jones on appeal. The veracity of Jones' claim is in question. There was discussion regarding Pumphrey's continued representation for trial of the health care fraud count, but none regarding representation in the appeal. *Id.* Jones fails to show Pumphrey was deficient in his performance regarding Jones ability to appeal. Moreover, the Clerk entered a Notice of Appeal on the same day of Jones' sentencing – Jones fails to show he was prejudiced because his

opportunity to appeal was properly preserved. Accordingly, Pumphrey's alleged failure as related to filing an appeal was not ineffective assistance of counsel.

## C. Ineffective Assistance of Counsel Claims against Inman

Jones alleges that Inman was ineffective for: (1) failing to present evidence, communicate, or prepare a defense; (2) refusing to allow him to testify; (3) refusing to call witnesses; and (4) refusing to impeach witnesses. Jones has raised these issues on a number of occasions without success, including during two separate hearings on a request for a new counsel, at trial, and on direct appeal. For example, during the October 15, 2014 hearing on his request for new counsel, Jones asserted that Inman failed to communicate with him, refused to call witnesses, and refused to present evidence. *See* Crim. Dkt. 343 at 8-10. The Court will address these allegations in turn.

### 1. Presumption

Jones asserts that he is entitled to a presumption of ineffective assistance of counsel because there was a complete breakdown in communication with Inman. *See* Dkt. 14 at 5-6 (citing *United States v. Cronic*, 466 U.S. 648, 658 (1984), *United States v. Soto Hernandez*, 849 F.2d 1325, 1328 (10th Cir. 1988)). Courts have found a presumption of ineffectiveness when the dispute between the defendant and his lawyer was such that the defendant would not cooperate or in any manner communicate with his lawyer. *See Brown v. Craven*, 424 F.2d 1166, 1169 (9th Cir. 1970). In *U.S. v. Williams,* the presumption was found where the attorney/client "relationship had been a stormy one with quarrels, bad language, threats, and counter-threats". 594 F.2d 1258, 1260 (9th Cir. 1979). *Cronic* explains that a presumption of ineffective assistance of counsel is appropriate when there is a "complete denial of counsel." 466 U.S. at 659. "[A] trial is unfair if the accused is denied counsel at a critical stage of his trial … [or] if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing." *Id*. The United States Supreme Court has

further explained that *Cronic* is a "narrow exception" to *Strickland*. *Florida v. Nixon*, 543 U.S. 175, 190 (2004). The Seventh Circuit has explained that "[i]n order for this standard to apply, however, the attorney's failure must be complete, meaning that the defense counsel must have 'failed to oppose the prosecution throughout the sentencing proceeding as a whole.'" *United States v. Peterson*, 711 F.3d 770, 780 (7th Cir. 2013) (citing *Bell v. Cone*, 535 U.S. 685, 697 (2002)).

Although Jones and Inman did not agree on strategy, the two were able to communicate prior to trial during jail visits and through the mail, as Jones was a prolific letter writer. The two were able to behave appropriately and cordially on most occasions. Moreover, Inman was present at every hearing, made reasonable objections, and provided a defense at all points of the litigation, so it cannot be said that Inman completely failed to oppose the prosecution. Moreover, Inman affirmed on several occasions to multiple judges that he had reviewed all evidence, including the documents presented to him by Jones, and was prepared to defend Jones. The conflicts between Inman and Jones did not "frustrate" Inman's ability to provide the effective assistance of counsel that the Sixth Amendment guarantees. Thus, it is inappropriate to apply a presumption of ineffective assistance of counsel.

## 2.   Failing to Present Evidence, Communicate, or Prepare a Defense

Jones asserts that Inman failed to present any evidence in his support or to prepare any defense. Jones also asserts that Inman failed to communicate with him throughout the trial. It is true that a defense attorney has a responsibility to reasonably investigate the circumstances of the case against his client. *See Bruce v. United States*, 256 F.3d 592, 587-89 (7th Cir. 2001). With respect to trial strategy, an attorney's trial strategy is "virtually unchallengeable" after counsel has conducted a thorough investigation of his client's case. *Sullivan v. Fairman*, 819 F.3d 1382, 1391 (7th Cir. 1987) (citing *Strickland*, 466 U.S. at 690-91). "[A] court must indulge a strong

presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (internal quotation omitted). An attorney's duty is not to raise every conceivable defense or obstruction. *Fuller v. United States*, 398 F.3d 644, 652 (7th Cir. 2005).

As an initial matter, Jones has brought these same arguments before two magistrate judges and a district court judge with no success. During these prior hearings and at trial, Inman defended his actions vigorously. Inman asserted that the defense Jones wanted to present would be much like that of Jones' first trial, where both Jones and his wife testified, but the jury still found him guilty in less than an hour – that is, Jones would have his defense "slammed down his throat." *See, e.g.*, Crim. Dkt. 343 at 18-19. Inman also asserted that he had read through "every piece of paper that the government has now," had reviewed everything necessary to understand the case, and had read and followed up on every letter Jones had sent him. *Id.* at 16, 18. Inman further stated on multiple occasions that he believed it would be damaging, and would actually be malpractice, to present the witnesses and evidence Jones wanted him to present. He believed that the desired testimony would be perjurious and the desired evidence was doctored and would be presented in a misleading manner. *See, e.g.*, Crim. Dkt. 337 at 64. Regarding his alleged failure to communicate, Inman defended himself that that was not true, explaining, "I mean, that's just it. I have to listen to this every time I go see him. He's incapable of telling the truth and talking about things. So it doesn't do any – it's counterproductive." Crim. Dkt. 347 at 13-14.

Jones identifies certain evidence he believes should have been presented, including (1) photos of patients he treated on the weekends, (2) sign-in sheets showing he scheduled patients on the weekends, (3) various medical documents signed by all patients, such as consents to

treatment, fee agreements, understanding billings, fee sheets, (4) PowerPoint and explanatory charts, and (5) evidence regarding Wabash Insurance Company's failure to pay. *See* Dkt. 1 at 2-3. However, Jones fails to show how any of these documents would be relevant, admissible, or exculpatory such that the result of the health care fraud proceedings would have been different. The Government presented overwhelming evidence that Jones was billing for time he spent seeing patients when no patients were there, and also "up-coding," billing for family counseling as individual counseling for each member. *See* Crim. Dkt. 339 at 8-9. For example, Jones billed for 23 hours of patient interaction on New Year's Eve, December 31, 2007. *Id.* Another patient was billed for the months of June, July and August, despite the fact that she was in Pennsylvania during those months. Crim. Dkt. 337 at 68-69. None of the evidence Jones has identified would be relevant or exculpatory on the charge of health care fraud.

Here, where Inman had stated in court that he had conducted a thorough investigation of Jones' case, and that he had reviewed every piece of paper that the Government had and everything necessary to understand the case, Jones fails to overcome the presumption that Inman's conduct and general defense was sound trial strategy. *Frentz*, 876 F.3d at 293.

Additionally, the alleged failure of Inman to discuss with Jones his trial strategy does not mean there was no theory and no line of defense. In his closing argument, Inman argued that Jones' actions of inaccurate coding and "bad billing practices" were not criminal actions, rather these types of discrepancies should be resolved civilly and "doesn't get him into the criminal realm beyond a reasonable doubt." Crim. Dkt. 376-29 at pages19-27. Inman asked the jury to return a verdict of not guilty. *Id.* Jones fails to proffer what defense he believes would have been more appropriate such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Thus, Jones

fails to satisfy both prongs of *Strickland*, and his claim of ineffective assistance of counsel on these issues fails.

### 3.     <u>Refusing to Allow Jones to Testify</u>

Jones claims he was denied effective assistance of counsel because he was not permitted to testify at his trial even though he wanted to. He asserts that he reluctantly agreed not to testify because his attorney had not prepared him for questioning.

Although a defendant has a constitutional right to testify on his own behalf, Jones must show that his attorney prevented him from testifying and that there is a reasonable probability that his failure to testify affected the outcome of the trial. *See Barrow v. Uchtman*, 398 F.3d 597, 608 n. 12 (7th Cir. 2005); *see also Alexander v. United States*, 219 Fed. Appx. 520, 523 (7th Cir. 2007) ("a defendant … must still show…that there is a reasonable probability that his failure to testify affected the outcome of the trial"); *Canaan v. McBride*, 395 F.3d 376, 385-86 (7th Cir. 2005) (explaining counsel's deficient performance regarding defendant's right to testify also must undermine confidence in outcome of trial to satisfy *Strickland*).

During his appeal, Jones had already asserted that he was denied the right to testify during his health care trial. The Seventh Circuit rejected this claim, noting that "[b]ased on our review of the record, we disagree. The district judge correctly found that Jones waived his right to testify. The judge engaged in three colloquies with Jones on the subject. While Jones's responses during the first two colloquies were ambiguous, his third response was an unequivocal waiver." *Jones,* 844 F.3d at 645. The Seventh Circuit held that the "district judge here made clear that the decision whether to testify was ultimately up to Jones, and she asked three times to ensure that his waiver was knowing and voluntary," and therefore, because he was properly apprised of his constitutional

right, Jones waived it. *Id.* at 646. Thus, Jones fails to show that Inman prevented him from testifying.

Even if Jones could show that Inman was deficient for failing to call him as a witness, Jones does not explain what testimony he would have provided or how there is a reasonable probability that his failure to testify affected the outcome of the trial. Rather, Inman asserted at prior court hearings that he believed Jones' testimony would be damaging and that Jones was "incapable of telling the truth." Crim. Dkt. 347 at 13-14. As in the *Alexander* case, it is likely that Jones "ignores the reality that, had he taken the stand, he surely would have been impeached, … which would have weighed against his credibility." *See Alexander*, 219 Fed. Appx. at 524. Viewed against the Government's overwhelming evidence, it seems more likely that Jones' testimony would have bolstered the jury's confidence in its guilty verdict. *See United States v. Jocic*, 207 F.3d 889, 893 (7th Cir. 2000) (explaining that, if "defendant decides to testify and deny the charges against him and the finder of fact thinks he is lying, his untruthful testimony becomes evidence of guilt to add to the other evidence"); *United States v. Williams*, 136 F.3d 1166, 1168 (7th Cir. 1998) ("[n]ot the least of the  evidence" the jury could have relied upon in finding defendant guilty was his own testimony).

Accordingly, Jones has failed to demonstrate that there was any deficient performance on the part of Inman or prejudice relating to Jones not testifying during the health care fraud trial.

### 4. Refusing to Call Witnesses

Jones alleges that Inman failed to investigate and was deficient for refusing to call any witnesses. Inman denied on several occasions that he failed to investigate the witnesses that Jones proffered. Jones specifically identifies Dr. William Bock, who spoke in his defense during

sentencing, and other expert "on line coders", who were not specifically identified. *See* Dkt. 1 at 3-4; Dkt. 16 at 8.

As set forth previously, "[t]he Constitution does not oblige counsel to present each and every witness that is suggested to him." *Blackmon*, 823 F.3d at 1103. "Rather, counsel need only investigate possible lines of defense and make an informed decision." *Id*. "If counsel has investigated witnesses and consciously decided not to call them, the decision is probably strategic." *Best*, 426 F.3d at 945. Strategic decisions like these, so long as they are made after a thorough investigation of law and facts, are "virtually unchallengeable." *Strickland*, 466 U.S. at 690.

As an initial matter, Jones alleges there are expert "on line coders" that should have been called as witnesses, but fails to specifically identify them or provide any affidavit as to the testimony they would have allegedly provided. The only "expert" he identifies is Dr. William Bock, who Jones asserts "would have explained the codes and also said he agreed with them at trial." Dr. Bock testified in Jones' support during his firearms charge sentencing on March 25, 2014. Dr. Bock, unfortunately, died the day after he testified on March 26, 2014. Inman was appointed as Jones' counsel on April 18, 2014. Jones' health care fraud trial was not held until October 2014. It is unclear how Jones could expect Inman to call Dr. Bock as a witness, when Dr. Bock died before Inman was even appointed counsel and long before his October 2014 trial.

As to the other expert "on line coders," Inman testified that he had investigated a potential witness, but realized that if he were to call her, it would be "one of the biggest cases of malpractice ever":

> [Inman:] The letters that he sent me, I've read, I've followed up on. I told him that this case was so paper intensive and record intensive that I needed to get my arms around all of that to be able to make a judgment as to what he was telling me about this coding.

His wife, Larissa, approached a company called SuperCoder.com, which is potentially a -- does medical billing and coding that's complex, although it's not in this case. She sent some inquiries to a woman named Jennifer Godreau about certain coding questions. Of course, Ms. Jones didn't tell Ms. Godreau, who I've talked to, that it wasn't about her, that it was about Bruce. And she also neglected to tell her that this is a health care fraud case.

Ms. Godreau's answers that she sent Ms. Jones are not the answers that Mr. Jones gave me as being sent by Ms. Godreau. So, once I talked to Ms. Godreau last week, I realized that not only would she not -- that if I called her as a witness, it would be the -- one of the biggest cases of malpractice ever, because she would just lay out Mr. Jones' analysis of his coding.

And it's that type of stuff that he thinks he has, that he doesn't have, that will just come and backfire on him extraordinarily badly. That's just an example of what I've been asked to do and what I've had to fend off.

Crim. Dkt. 343 at 16-17. Regarding other witnesses Jones wanted to call, Inman had definitively stated in court that "[t]hey would hurt him." Crim. Dkt. 347 at 13. Thus, Inman's informed strategic decisions to not pursue these lines of testimony are "virtually unchallengeable." *Strickland*, 466 U.S. at 690. Moreover, Jones fails to show, under the second prong of *Strickland*, that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Accordingly, Inman's failure to call or investigate these witnesses was not ineffective assistance of counsel.

### 5. Refusing to Impeach Witnesses

Jones identifies numerous occasions where he asserts Inman failed to properly cross-examine and impeach the Government's witnesses. *See* Dkt. 1 at 4; Dkt. 16 at 8. Much of the alleged impeachment documents appear to be letters from patients thanking Jones for treating them and stating that the billing was accurate. Jones asserts the verdict would have been different because the jury would have viewed him as a caring person instead of a greedy psychotherapist. Dkt. 1 at 4.

"[D]eciding what questions to ask a prosecution witness on cross-examination is a matter of strategy." *United States v. Jackson*, 546 F.3d 801, 814 (7th Cir. 2008). Courts "do not second guess the reasonable tactical decisions of counsel." *Johnson v. Thurmer*, 624 F.3d 786, 792 (7th Cir. 2010).

During trial, Jones approached the Court with his assertion that Inman failed to impeach the Government's witnesses. *See* Crim. Dkt. 337 at 62-63. Inman asserted that he could not use these documents to impeach the witnesses because it would backfire and be misleading. *See* Section II(C); Crim. Dkt. 337 at 63-64 ("I believe that most of what he has is either doctored or misleading or false."). Jones also admits in his petition that Inman already rejected much of this evidence as made up or doctored. *See* Dkt. 1 at 4. Thus, Jones fails to overcome the presumption that Inman's line of questioning and decisions regarding how to impeach witnesses were sound trial strategy. An attorney's duty is not to raise every conceivable defense or obstruction. *Fuller,* 398 F.3d at 652.

Moreover, the Government provided testimony on thirteen of Jones' patients, all of whom testified that Jones billed for time they did not meet with him. Jones provides letters or testimony from non-witnesses that he asserts would have impeached five of the witnesses' testimonies, but not all thirteen. The evidence he does provide is not exculpatory of his billing practices. Thus, Jones fails to show how he was prejudiced or that there was a "reasonable probability that, but for counsel's errors, the result of the proceedings would have been different, such that the proceedings were fundamentally unfair or unreliable." *Strickland*, 466 U.S. at 687.

Accordingly, Jones fails to show that Inman's cross-examination, line of questioning decisions, and refusal to impeach in a certain manner were ineffective assistance of counsel.

D.    **Sentencing Computation**

Jones appears to allege that his sentencing computation was improper for "looking back" to his "1984" conviction. *See* Dkt. 17 at 1-2. Although Jones states in his email correspondence that his conviction was from 1984, the Court notes his prior felony conviction was in 1985.

Jones already raised this issue on appeal, and thus any arguments on this issue are foreclosed by the law of the case. *See Fuller,* 398 F.3d at 648 ("In the context of § 2255 petitions, the law of the case doctrine dictates that once this court has decided the merits of a ground of appeal, that decision establishes the law of the case and is binding on a [court] asked to decide the same issue in a later phase of the same case, unless there is some good reason for reexamining it.") (Internal citations and quotations omitted). The Seventh Circuit previously explicitly rejected Jones' assertion that the district court should have disregarded his prior 1985 felony conviction in calculating his sentencing guidelines range. *Jones*, 844 F.3d at 647. Thus, relief is not available to Jones on this ground.

## IV.    CONCLUSION

For the reasons explained in this Entry, Jones is not entitled to relief on his § 2255 motion. There was no ineffective assistance of counsel and his sentence was not unconstitutional. Accordingly, his motion for relief pursuant to § 2255 is **DENIED** and this action is **dismissed with prejudice.** Judgment consistent with this Entry shall now issue and the Clerk shall **docket a copy of this Entry in No. 1:12-cr-00072-TWP-DML.** The motion to vacate shall also be **terminated** in the underlying criminal action.

## V.    CERTIFICATE OF APPEALABILITY

A habeas petitioner does not have the absolute right to appeal a district court's denial of his habeas petition, rather, he must first request a certificate of appealability. *See Miller–El v.*

*Cockrell,* 537 U.S. 322, 335 (2003); *Peterson v. Douma,* 751 F.3d 524, 528 (7th Cir. 2014). Pursuant to Federal Rule of Appellate Procedure 22(b), Rule 11(a) of the Rules Governing § 2255 Proceedings, and 28 U.S.C. § 2253(c), the Court finds that Jones has failed to show that reasonable jurists would find "it debatable whether the petition states a valid claim of the denial of a constitutional right." *Slack v. McDaniel,* 529 U.S. 473, 484 (2000). The Court therefore **DENIES** a certificate of appealability.

   **SO ORDERED.**

Date: 7/27/2018

                   TANYA WALTON PRATT, JUDGE
                   United States District Court
                   Southern District of Indiana

DISTRIBUTION:

Mario Garcia
BRATTAIN MINNIX GARCIA
mario@bmgindy.com

Brian L. Reitz
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
brian.reitz@usdoj.gov

James Robert Wood
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
bob.wood@usdoj.gov